# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 17-cv-02670-MSK

**SECURITIES AND EXCHANGE COMMISSION,**

    Plaintiff,

v.

**THE END OF THE RAINBOW PARTNERS, LLC,**

    Defendant,

and

**CAROLYN M. ANDERSON,**
**THE END OF THE RAINBOW FOUNDATION, INC., and**
**SEAOMA CONSULTING COMPANY,**

    Relief Defendants.

---

## OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND DEFAULT JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to Relief Defendant Carolyn Anderson's Objections **(# 106)** to the Magistrate Judge's Recommendation **(# 105)** that Ms. Anderson's Emergency Motion for Release of Funds **(# 66)** be denied, the Plaintiff's ("SEC") response **(# 107)**, and Ms. Anderson's reply **(# 109)**; the SEC's Motion for Default Judgment **(# 68)** against Defendant The End of the Rainbow Partners, LLC ("Rainbow") and Relief Defendant The End of the Rainbow Foundation, Inc. ("Foundation"), to which no response was filed; and the SEC's Motion for Summary Judgment **(# 70)** against Ms. Anderson, Ms. Anderson's response **(# 75)**, and the SEC's reply **(# 82)**. Also pending is Defendant Seaoma Consulting Company's ("Seaoma") Motion to Withdraw as Counsel **(# 76)** and the SEC's

1

Motion to Strike **(# 101)** those portions of Docket #99 that constitute Ms. Anderson's homestead exemption argument.

## FACTS

The Court summarizes some of the pertinent facts here, and elaborates in detail as part of its analysis. Michael Anderson (Ms. Anderson's late ex-husband) founded Rainbow, purportedly an investment fund that Mr. Anderson promised would return handsome rewards to investors. Investors were told that a portion of Rainbow's trading gains would be directed to the Foundation, a non-profit charitable organization founded by Ms. Anderson. In reality, Rainbow was little more than a securities fraud Ponzi scheme through which Mr. Anderson falsely claimed trading gains, distributed fabricated monthly account statements to investors, and used incoming investors' funds to pay redemption requests by existing investors. Mr. Anderson diverted a considerable portion of investor funds – more than $2 million of the $5.3 million invested in Rainbow – to his own benefit or to Ms. Anderson and her creditors. Payments to or for the benefit of Ms. Anderson were made either directly or through the Foundation and Seaoma, an entity through which Ms. Anderson provided ministerial work to Rainbow.

Mr. Anderson died in February 2017, in the midst of the SEC's investigation into Mr. Anderson's activities. Shortly before his death, Mr. Anderson gave the SEC a confessional affidavit that conceded the fraudulent nature of Rainbow's operation (but which exculpated Ms. Anderson from involvement).

The SEC commenced this action in November 2017, charging Rainbow with various counts of securities fraud. In addition, the SEC named Ms. Anderson, the Foundation, and Seaoma as relief defendants, alleging that they were in possession of investor funds improperly diverted by Mr. Anderson, to which they had no legitimate claim. Simultaneously with the

commencement of the action, the SEC sought a Temporary Restraining Order **(# 2)** that froze some portion of the Relief Defendants' assets.  On November 14, 2017, this Court granted that request in part **(# 5)**, freezing $66,000 of the Foundation's assets and $465,000 in assets held by Ms. Anderson individually.   The Court invited the parties to request an evidentiary hearing on whether that *ex parte* asset freeze should be continued, but after a series of proceedings, the parties consented to the *ex parte* freeze remaining in place.  *See generally* Docket # 78.

In September 2018, Ms. Anderson moved **(# 53)** to dissolve the asset freeze, alleging that the freeze improperly encumbered proceeds from a sale of home in Vail, Colorado that Ms. Anderson purchased with her own funds before Mr. Anderson began his fraudulent scheme, and that she had a legitimate claim to several hundred thousand dollars of funds Mr. Anderson paid her as back child support, alimony, and rent.  The Court denied **(# 78)** Ms. Anderson's motion.

While Ms. Anderson's motion to dissolve the freeze was pending, she filed the instant Emergency Motion For Release of Funds **(# 66)**.  The Emergency Motion argued (among other things) that: (i) the SEC made material misrepresentations about the circumstances in order to obtain the asset freeze; (ii) the SEC misrepresented the start date of Mr. Anderson's scheme, and that, in reality, the scheme began even earlier when Mr. Anderson swindled Ms. Anderson out of more than $1 million of her own funds that he purportedly "invested" in Rainbow, making her a victim of his scheme as well; and (iii) that the SEC misrepresented facts about Ms. Anderson's purchase of the Vail house, concealing the fact that Ms. Anderson purchased the home with her own un-tainted funds before Mr. Anderson's scheme began.  The undersigned referred Ms. Anderson's Emergency Motion to the Magistrate Judge to conduct an evidentiary hearing and recommend a disposition.

On November 25, 2019, the Magistrate Judge recommended **(# 105)** that Ms. Anderson's Emergency Motion be denied.[1] The Magistrate Judge specifically found: (i) that Rainbow made payments totaling $447,500 to Ms. Anderson between July 2014 and October 2016 through various accounts; (ii) that Ms. Anderson purchased the Vail home for $330,000 in 2012, using her own personal funds for the down payment, but that Ms. Anderson used $160,000 of funds improperly transferred to her from Rainbow (through Seaoma) to pay monthly mortgage payments on the property, amounting to "all (or nearly all) of the mortgage payments paid on the Vail house over almost three years"; (iv) that the intermingling of Ms. Anderson's ill-gotten gains from Rainbow with her personal funds prevented her from establishing her contention that the SEC misled the Court about the source of funds used to obtain the Vail house; (v) that Ms. Anderson's contention that Mr. Anderson's fraud commenced in November 2012 (with the founding of the Foundation), rather than March 2014 (with the commencement of Rainbow selling securities) was without merit; (vi) that the SEC did not mislead the Court about Ms. Anderson's purchase of a life insurance policy for Mr. Anderson (and that the proceeds of that policy were not subject to the asset freeze in any event); (vii) that Ms. Anderson failed to establish that she was ever an investor in Rainbow; (viii) that Ms. Anderson failed to establish that Mr. Anderson stole any funds from Ms. Anderson in or about 2012, and that even if he did so, that theft of funds would be unconnected with the fraud he perpetrated through Rainbow, which did not come into existence until 2014; (ix) that Ms. Anderson's contributions to the Foundation prior to the founding of Rainbow did not operate to make her an investor in Rainbow

---

[1] The Magistrate Judge also recommended that the Court grant the SEC's Motion to Strike **(# 101)** a portion of Ms. Anderson's written closing arguments filed in this case, to the extent it raised a new argument concerning homestead exemptions. Ms. Anderson did not object to this recommendation and the Court thus adopts it and grants the SEC's motion.

4

and did not entitle her to retain any disbursements that Mr. Anderson made to her from funds that investors subsequently placed with Rainbow; (x) that as a result of the foregoing findings, the asset freeze on Ms. Anderson's funds should remain; and (xi) Ms. Anderson did not show that she was so insolvent as to warrant an equitable release of funds for living expenses and attorney fees.

Ms. Anderson timely filed Objections **(# 106)** to the Recommendation. Ms. Anderson primarily argues that: (i) the SEC chose an artificial starting date for Mr. Anderson's scheme to conceal the fact that Ms. Anderson was also a victim of Mr. Anderson's scheme, having lost over $1 million; (ii) Ms. Anderson did not have actual control over bank accounts for which she had signature authority and that expenditures made from those accounts made by Mr. Anderson for his benefit did not benefit her. As a result, the SEC incorrectly showed such funds as transferred to her or her accounts.

The SEC moves **(# 70)** for summary judgment on its claims against Ms. Anderson and Seaoma, contending that Ms. Anderson received $447,000 in investor funds from Mr. Anderson to which she has no legitimate claim, and that Seaoma received some $360,000 in investor funds to which it holds no colorable claim. Ms. Anderson filed a response **(#75)**, in which she mostly iterated her Objections. Seaoma filed no response to the SEC's motion, but on the due date for such a response, Seaoma's counsel filed a motion seeking leave to withdraw from Seaoma's representation **(#76)**, as Seaoma "has no assets and no current corporate existence." The SEC also filed a motion seeking entry of a default judgment **(# 68)** against both Rainbow and the Foundation.

# ANALYSIS

**A. Ms. Anderson's Objections**

The Court begins with the SEC's summary judgment motion and, as explained below its determination resolves all claims against Ms. Anderson on their merits. Thus, it is not necessary to specifically address Ms. Anderson's Objections to the Recommendations on her Emergency Motion which only sought provisional relief. The Court's determination of the SEC's motion for summary judgment effectively renders Ms. Anderson's Emergency Motion moot.

However, were the Court to consider Ms. Anderson's Objections, it would summarily deny them as insufficiently specific. Fed. R. Civ. P. 72(b)(2) provides that a party who disagrees with a Magistrate Judge's recommendation for disposition of a motion "file specific written objections." In *U.S. v. One Parcel of Real Property*, 73 F.3d 1057, 1060-61 (10th Cir. 1996, the 10th Circuit considered the question of whether a litigant had tendered sufficiently specific objections when, in response to a recommendation, the party filed objections consisting of "only two sentences asking that the district court reconsider the magistrate's report and recommendation based on 'the motions, exhibits, testimony[,] briefs, and arguments' that the [party] had [previously] submitted to the court." The 10th Circuit held that such generalized "objections" failed to satisfy the requirement of specificity, as "only an objection that is sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute will advance the policies behind the Magistrate's Act." Thus, the court held that the party's filing of inadequate objections essentially operated as a waiver of further judicial review of the recommendation.

Although Ms. Anderson's objections are longer than the two sentences in *One Parcel*, the effect is the same: Ms. Anderson has simply repeated, essentially by cut-and-paste, the identical

arguments she made to the Magistrate Judge. She does not point to any specific finding by the Magistrate Judge that she contends are erroneous, nor does she point to specific instances where the Magistrate Judge misapprehended or misapplied existing authority. *See generally Wofford v. Colvin*, 570 Fed.Appx. 744, 745-46 (10th Cir. 2014). If the wholesale incorporation of prior briefing by reference was insufficiently in *One Parcel*, then Ms. Anderson's Objections are as well. Her Objections do nothing to sharpen the issues considered and resolved by the Magistrate Judge. Thus, the Court would overrule Ms. Anderson's Objections as insufficiently specific without reaching their merits and would further find that Ms. Anderson has waived further judicial review of her Emergency Motion. Were the Court to reach the merits of Ms. Anderson's Objections, the Court would overrule them as there is no clear error in the well-supported Recommendation.

### B. SEC's summary judgment motion against Ms. Anderson

The SEC seeks summary judgment of disgorgement from Ms. Anderson in the amount of the $466,000 that is in Ms. Anderson's possession and subject to the ongoing asset freeze.

The SEC brings claims against Ms. Anderson as a Relief Defendant; she is not accused of having personally engaged in or assisted any of Mr. Anderson's own wrongdoing. In civil enforcement actions, courts have broad equitable powers to order disgorgement from third parties who have received the proceeds of another's violation of securities laws if the party in possession of the proceeds has no legitimate claim to it. *S.E.C. v. World Capital Market, Inc.*, 864 F.3d 996, 1003-04 (9th Cir. 2017). To establish a claim for disgorgement against Ms. Anderson, the SEC must show: (i) that she received funds from Mr. Anderson that were ill-gotten by him; and (ii) that she does not have a legitimate claim to those funds. *Id.* at 1004.

Nearly all of the pertinent facts are undisputed. Except as discussed below, it is undisputed that Mr. Anderson formed Rainbow and began soliciting investments in it from third parties beginning in or about March 2014. It is undisputed that, over its lifetime, Rainbow took in nearly $5.3 million in investor funds and paid out $1.9 million, leaving about $3.4 million unaccounted. It is undisputed that Mr. Anderson engaged in rampant securities fraud through Rainbow, falsely advising investors that Rainbow's trading activities were generating profits and providing investors with fraudulent monthly statements showing profits from trades.

The affidavit of Kerry Matticks, an SEC accountant, traces Rainbow's disbursements of a portion of the $3.4 million in investor funds to various recipients. Mr. Matticks calculated that Rainbow disbursed $447,530[2] to Ms. Anderson, $219,992 to the Foundation, and $360,000 to Seaoma, among others (leaving a balance of $1.5 million unaccounted for). Ms. Anderson has not identified any portion of Mr. Matticks' affidavit that is disputed by evidence in the record.[3] The SEC contends that Ms. Anderson was neither an investor in nor that she provided meaningful services to Rainbow, such that she lacks any legitimate entitlement to the funds she received. As discussed below, Ms. Anderson disputes that she was not an investor in Rainbow, but does not appear to dispute that she never rendered any services of value to it.

Thus, Ms. Anderson's summary judgment response essentially presents one overriding issue of dispute that the Court must examine and resolve: whether Ms. Anderson was an investor in Rainbow, such that she may claim a legitimate entitlement to the $465,000 in frozen funds as

---

[2] This figure subtracts an $18,000 sum that Ms. Anderson transferred to Rainbow on an unspecified occasion.

[3] In other contexts, Ms. Anderson has raised the issue that the $465,000 in frozen funds are traceable to the sale of her Vail home and not to any investor funds from Rainbow. She has not repeated that argument in her summary judgment response and the Court deems her to have abandoned it.

being a refund/proceeds of her investment. Embedded within that issue is another disputed question of when Mr. Anderson's fraud began.

Ms. Anderson argues that she is entitled to the frozen funds as repayment of her investment in Rainbow. This is based on several assertions: (i) Mr. Anderson's fraudulent scheme began not in 2014 with the founding of Rainbow, but instead in November 2012 when he induced Ms. Anderson to form the Foundation for the purpose of recruiting investors in Rainbow; (ii) Mr. Anderson exercised control over and misappropriated some $1.063 million in Ms. Anderson's personal funds in starting and operating the Foundation; (iii) because the workings of the Foundation and Rainbow were intertwined, Ms. Anderson's $1.063 million "investment" in the Foundation was effectively an investment in Rainbow; (iv) alternatively, Ms. Anderson invested considerable funds of her own directly into Rainbow; (v) the various payments Ms. Anderson received directly from Rainbow or indirectly through the Foundation represent redemption of or profits derived from her investment in Rainbow.

The Court finds several of Ms. Anderson's contentions to be either legally or factually unsupported, and thus finds that she has not demonstrated a genuine issue of fact as to whether she has a legitimate entitlement to the frozen funds.

1. Commencement of the scheme

The Court begins with Ms. Anderson's argument that Mr. Anderson's fraudulent scheme began in November 2012 with the formation of the Foundation. It is clear that, to be actionable under securities laws, a fraudulent scheme must involve the purchase or sale of securities. *See generally S.E.C. v. Zandford*, 535 U.S. 813, 819-20 (2002). Nothing in the record suggests that the Foundation ever engaged in the purchase or sale or securities. (Indeed, the record is entirely opaque as to what, if anything, the Foundation actually did.) Thus, any fraud or conversion that

9

Mr. Anderson perpetrated on Ms. Anderson regarding or during the formation of the Foundation is a wrong not redressable through the securities laws. *Id.*, *citing Marine Bank v. Weaver*, 455 U.S. 551, 556 ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud").

Ms. Anderson seeks to avoid this outcome by contending that the Foundation and the securities fraud that Mr. Anderson committed through Rainbow are fundamentally linked, forming a single, unitary scheme. Ms. Anderson does not cite to any authority for the proposition that acts which do not themselves involve the purchase or sale of securities, but which indirectly "set the stage" for future securities fraud are treated as part of a single securities fraud scheme. Quite to the contrary, the logical extension of the argument demonstrates its weakness. Imagine a fraudster offers a sumptuous catered buffet potential investors. After the meal, a presentation to potential investors hawks sham securities, and shortly after conclusion of the presentation the fraudster skips town with the investors' money. By Ms. Anderson's logic, the unpaid caterer would have a remedy for securities fraud because the promise of a lavish buffet (like the Foundation) was part of the overall scam. Absent case law to demonstrate such elasticity in the definition of securities fraud, the Court cannot find that Ms. Anderson has a right of offset as a victim of Mr. Anderson's securities fraud.

But even if the Court were inclined to accept that proposition in the abstract, Ms. Anderson has not come forward with facts that demonstrate that at the time of its formation, Mr. Anderson intended the Foundation to be part of his later executed securities fraud scheme. She does not, for example, identify conversations with Mr. Anderson in November 2012 wherein he explained that the Foundation was being formed to entice future investors in a yet-to-be-created investment fund or to eventually receive the proceeds from that fund. Nor does she point to any

particular evidence that would suggest that Mr. Anderson had formulated the entire fraudulent scheme by November 2012. Indeed, the record is effectively silent as to why the Foundation was formed and what Ms. (and Mr.) Anderson intended to accomplish with it at the time it was formed.[4] It is just as plausible that Mr. Anderson caused the Foundation to be formed for legitimate purposes (or, at the very least, entirely <u>different</u> fraudulent purposes) at the time, and only later realized that it could be pressed into service to further his newly-conceived Rainbow scheme. Ms. Anderson's failure to come forward with admissible evidence that links the formation of the Foundation with the future Rainbow scheme prevents her from demonstrating a genuine dispute of fact as to whether Mr. Anderson's fraud began earlier than March 2014.

2. Ms. Anderson's status as a Rainbow investor

Ms. Anderson's affidavit states that in November 2012, she had a balance in her personal bank account of $1.063 million. She stated that "[Mr.] Anderson controlled" that account, and that in the years that followed, he "stole this $1.063 million from my account in order to perpetrate his securities fraud." Ms. Anderson offers few details of when and how this theft of her $1 million occurred. She states that Mr. Anderson "used my personal funds to create [the] Foundation" in 2012 and "to pay an attorney to get it designated as a [non-profit] charitable

---

[4] Ms. Anderson points to a 2015 police report in which Vail, Colorado police investigated a matter involving Quinn Sypniewski, a retired football player-turned-day trader that befriended and ultimately worked with Mr. Anderson. According to the report, Mr. Sypniewski stated that "Mr. Anderson told him about a non-profit organization his wife, Ms. Carolyn Anderson, was starting . . . Once Mr. Sypniewski and Mr. Anderson began to spend more time together and Mr. Sypniewski was learning about day trading, Mr. Anderson advised he was going to start an investment club as an offshoot of the [Foundation]."
    This evidence does not suggest that Mr. Anderson conceived of the Foundation and Rainbow simultaneously as components of a single, unitary scheme. Rather, it reflects that Mr. Anderson spoke of the Foundation itself, and only some time later, spoke of starting Rainbow and linking it to the Foundation. In any event, the contents of the police report are hearsay and Ms. Anderson has not produced an affidavit from Mr. Sypniewski himself to attest to the accuracy of the facts related in the report.

11

foundation" in March 2013, although her affidavit does not attach dollar costs to each of these activities. She alleges that "thereafter, [Mr. Anderson] used my personal funds to rent an office for [the] Foundation and pay employees." She also alleges that he "convinced me to fund [the] Foundation with $100,000 paid from my personal funds and deposited into the [ ] Foundation account in August 2013." In her response brief, Ms. Anderson seems to suggest (without citation to supporting evidence) that the funds spent to establish the Foundation and certify it as a non-profit amounted to $513,000, and that the cost of renting the office and hiring employees consumed $307,000. *Docket # 75 at 9.* (Her brief also makes a cryptic reference to Mr. Anderson misappropriating $77,396.25 of her funds in March 2014, again without citation to the record.)

These figures would seem to account for most of the $1.063 million that Ms. Anderson claims Mr. Anderson misappropriated from her and they suggest that practically all of her funds were spent on creating and maintaining the Foundation itself. Clearly, Mr. Anderson's expenditure of Ms. Anderson's funds in the creation and operation of the Foundation did not grant her an ownership interest in Rainbow. Like the caterer in the example above, most favorably construed, Ms. Anderson's funds were spent laying out the buffet – here, the Foundation which may have attracted investors to the scheme. Although Ms. Anderson may have been owed money used in the creation of the Foundation, its debt to her did not make her an investor in or creditor of Rainbow. There might be some merit to her claims if there was a merging of the Foundation and Rainbow, but as noted above, the record is entirely silent as to what, if anything, the Foundation did, much less whether it provided anything of value to Rainbow. Thus, the record does not reflect that Ms. Anderson's (involuntary) expenditures in

12

creating and maintaining the Foundation give her any legitimate claim to retain investor funds diverted from Rainbow.

Ms. Anderson also makes a passing, but factually-underdeveloped, argument that she was also a direct investor in Rainbow itself. Ms. Anderson's response brief repeatedly asserts that she invested varying amounts[5] in Rainbow, but she points to no particular evidence of such investments, such as checks, bank transfers, or receipts. Ms. Anderson argues that Rainbow's monthly statements identify her "as having an investment of nearly $800,000" (which includes a $300,000 investment she made as Trustee of funds belonging to her children). But she cites to no evidence in the record supporting this assertion, and in her deposition, she was asked "did you receive account statements like other investors" and she answered "no" and that "he [Mr. Anderson] just told me" how her investments were doing.

Indeed, it is not entirely clear from the record that Ms. Anderson has any personal knowledge as to whether she was actually an investor in Rainbow. She testified about having $1.2 million that "he" – meaning Mr. Anderson – "put in the [Rainbow] account," but the record seems to reflect that Ms. Anderson is simply repeating what Mr. Anderson told her he was doing with the money, not that she has personal knowledge that it was invested. She testified that she "assumed that it is in [Rainbow] because I signed the partnership agreement saying hat I was a member of the partnership of [Rainbow]." Ms. Anderson is referencing a Limited Liability Company Agreement for Rainbow that asserts, among other things, that she had made an Initial Capital Contribution of $25,000 (and perhaps additional contributions in $25,000 increments) in

---

[5]    Compare *Docket # 75* at 10 (stating that Ms. Anderson invested $500,000 of her own money in Rainbow) and at 7 (stating that her $1.063 million was used "to create[ ] and fund Rainbow"). *See also* Docket # 70-2 at 38 (Ms. Anderson testifying that Mr. Anderson put $1.2 million of her personal funds into Rainbow's brokerage account).

13

exchange for one share of ownership. The Agreement states that Rainbow would issue monthly statements that include "a breakdown of ownership and percentages" in Rainbow, but again, she has not produced any such statements that attest to her status as an investor. At various points in her deposition, Ms. Anderson made clear that Mr. Anderson "controlled everything. . . . I don't know why he moved from one place to another. He was opening up accounts in my name," such that she was "not exactly sure" what bank or brokerage accounts she had. By contrast, the SEC has tendered Mr. Matticks' affidavit. Mr. Matticks conducted an audit of Rainbow's records, and his records detail each of the investor deposits that form the $5.3 million in gross receipts that Rainbow took in. With the possible exception of two transfers from Ms. Anderson to Rainbow totaling $18,000, Rainbow's records do not evidence any investment deposits from Ms. Anderson.

Thus, it appears to the Court that there is no genuine dispute of fact as to whether Ms. Anderson was an actual investor in Rainbow. Rainbow's records reveal no such investment (or, at most, an investment of $18,000), Ms. Anderson has no records that demonstrate her investment, and Ms. Anderson ultimately acknowledges that she can only speculate as to whether she was actually an investor. Thus, the Court concludes that Ms. Anderson has failed to come forward with evidence that indicates that any of the money that was misappropriated from her by Mr. Anderson was used to purchase or sell securities in Rainbow. Thus, it does not appear that, with the possible exception of $18,000, Ms. Anderson was not an investor in Rainbow and thus, not a victim of securities fraud.

Accordingly, the Court finds that it is undisputed that Ms. Anderson received at least $447,530 in investor funds that were fraudulently obtained by Mr. Anderson. Further, there is no genuine dispute of fact that Ms. Anderson lacks a legitimate claim to those funds as a purported

investor in Rainbow. Thus, the SEC is entitled to summary judgment on its claim against Ms. Anderson for disgorgement of the $447,530. The SEC further contends that the Court should award it $58,691.86 in prejudgment interest against Ms. Anderson. Ms. Anderson did not respond to this request, and thus, the Court assumes she has no objection to it. Accordingly, the Court will award an additional $58,691.86, for a total disgorgement of $506,221.86.

**C. The SEC's summary judgment motion against Seaoma**

The SEC contends that Seaoma received $360,482.82 from Rainbow. It points to Ms. Anderson's deposition testimony in which she explains that, under the guise of Seaoma, she performed work for Rainbow in the form of "errands [such as] going to the office store or Costco or the printer store." She estimated that such work amounted to "a handful of hours, not many" per week, and that she kept no records of the time she spent and submitted no invoices to Rainbow for her work. The SEC argues that Seaoma cannot demonstrate that it provided Rainbow with services of any material value to investors, and thus, Seaoma lacks a legitimate claim to retain any of the $360,482.82.

Seaoma did not respond substantively to the SEC's argument. Instead, on the due date for a response, Seaoma's counsel (who also represents Ms. Anderson) moved to withdraw, stating that he "no longer has the time to devote to determining the rights of Seaoma and he has been paid no legal fees capable of funding the legal representation to adequately continue representation of Seaoma concurrently while representing [Ms.] Anderson." He went on to explain that Ms. Anderson, although identified as the principal of Seaoma, "has no information about the details of Seaoma except to the extent that she reviewed documents from discovery." He also asserts that Seaoma "has not asserts and no current corporate existence."

The Court need not decide whether Seaoma's counsel has shown good cause to withdraw because it is clear that the SEC is entitled to summary judgment on its claim for disgorgement against Seaoma. The SEC has made a *prima facie* showing that Seaoma received the proceeds of Mr. Anderson's fraud and that Seaoma has no legitimate claim to those funds. As is clear from Seaoma's counsel's affidavit, Ms. Anderson has no personal knowledge of facts that would demonstrate that Seaoma possesses a legitimate claim to such funds. To the extent that documents exist that might prove such a claim, Seaoma's counsel did not see fit to produce any. Thus, the Court deems Seaoma to have conceded the SEC's facts. Accordingly, the Court finds that the SEC is entitled to judgment of disgorgement against Seaoma in the amount of $360,482.22. The SEC also seeks prejudgment interest in the amount of $41,982.17. Seaoma having lodged no objection, the Court grants that request and enters an order of disgorgement against Seaoma in the amount of $402,465.17.

Seaoma's counsel's motion to withdraw is denied, both as to a lack of a showing of good cause and because, upon entry of judgment against Seaoma, the motion is now moot.

**D. Motions for default judgment**

The SEC seeks judgment by default against both Rainbow (for substantive securities fraud) and the Foundation (as a Relief Defendant). The Court addresses them in turn.

1. <u>As to the Foundation</u>

The record reflects that the SEC served **(# 9)** the Foundation with the Summons and Complaint on November 15, 2017 by personally delivering it to Ms. Anderson, the Foundation's registered agent at an address in Florida. Such service satisfies Fed. R. Civ. P. 4(h)(1). The record reflects that the Foundation did not appear or defend and on December 8, 2017, the Clerk of the Court entered **(# 26)** the Foundation's default.

16

According to the Complaint, the Foundation is a Colorado corporation with its principal place of business in Vail, Colorado. Thus, the Foundation is a citizen of Colorado and this Court has personal jurisdiction over it. The Court has subject-matter jurisdiction over the claim for disgorgement against the Foundation pursuant to 28 U.S.C. § 1331, among other provisions.

Given the Foundation's default, the Court treats the well-pled allegations in the Complaint as true, and examines the Complaint to determine whether the SEC establishes a claim for disgorgement on such facts. *U.S. v. Craighead*, 176 Fed.Appx. 922, 924 (10th Cir. 2006). Here, the Complaint amply alleges that Mr. Anderson engaged in a securities fraud scheme through Rainbow and that Rainbow transferred approximately $217,943 of proceeds from that fraud to the Foundation. *Docket # 1*, ¶ 27. The Complaint alleges that the Foundation had no office, employees, or operations and thus, had no legitimate claim to the funds it received from Rainbow. ¶ 30, 32. Accordingly, the SEC has established a claim for disgorgement against the Foundation.

The SEC has tendered Mr. Matticks' affidavit, which establishes that the amount to be disgorged by the Foundation is $219,992.69, plus prejudgment interest in the amount of $27,642, for a total of $247,635. Accordingly, the Court enters a default judgment against the Foundation in this amount.

2. As to Rainbow

The record reflects that Rainbow was served with process **(# 6)** on November 15, 2017, by delivering them personally to Ms. Anderson, Rainbow's registered agent in Florida, as well on November 15, 2017, by personally serving Debbie Woods, the designated agent of A Registered Agent, Inc., Rainbow's registered agent in Delaware. Such service complies with Fed. R. Civ. P. 4(h).

The Complaint alleges that Rainbow is a Delaware Limited Liability Company with its principal office in Vail, Colorado. The Complaint does not exhaustively list Rainbow's membership, but it alleges that Ms. Anderson and Mr. Anderson are among Rainbow's members. The Complaint alleges that Ms. Anderson was a resident of Colorado during the relevant time period, and evidence in this case indicates that Mr. Anderson was as well. Accordingly, the Court finds that it has personal jurisdiction over Rainbow. The Court has subject matter jurisdiction over the claims against Rainbow pursuant to 28 U.S.C. § 1331, among other provisions.

The Complaint alleges two claims against Rainbow: (i) securities fraud in violation of the Securities Act, 15 U.S.C. § 77q(a); and (ii) securities fraud in violation of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. The elements under each claim are essentially the same: the SEC must show (i) that Rainbow made a material misrepresentation, (ii) in connection with the purchase or sale of a security, (iii) with scienter, and (iv) using any means of interstate commerce or the mails. *Geman v. SEC*, 334 F.3d 1183, 1192 (10th Cir. 2003).

The Court need not recite the allegations in the Complaint in detail. It is sufficient to note that the Complaint reflects that Rainbow made various material misrepresentations to investors about the nature and extent of its trading activities involving securities, including concealing trading losses and misrepresenting the actual value of investors' holdings. Those misrepresentations were made by Mr. Anderson, on behalf of Rainbow, knowingly and with the intent to deceive the investors. The Complaint is somewhat conclusory as to Rainbow's use of interstate commerce to effectuate the scheme – paragraphs 9, 91, and 94 simply state the general conclusion that Rainbow "made use of the means or instrumentalities of interstate commerce, [or] of the mails" without elaboration. Nevertheless, the record sufficiently indicates that

Rainbow, through Mr. Anderson, used electronic inter-bank transfers (¶ 22), permitting the reasonable inference that such communications involved interstate commerce. Accordingly, the Court finds that the SEC has adequately established Rainbow's liability on both claims.

Mr. Matticks' affidavit establishes that as much as $1,539,431 in investor funds appears to remain in Rainbow's possession, and that all such funds are proceeds of the fraudulent scheme. In addition, Mr. Matticks calculates that prejudgment interest in the amount of $176,173 has accrued on that sum. Accordingly, the Court enters judgment against Rainbow in the amount of $1,715,594.

## CONCLUSION

For the foregoing reasons, Ms. Anderson's Objections **(# 106)** are **OVERRULED AS MOOT**, the Court **ADOPTS** the Magistrate Judge's Recommendation **(# 105)**, and **DENIES AS MOOT** Ms. Anderson's Emergency Motion for Release of Funds **(# 66)**. The Court **GRANTS** the SEC's Motion to Strike **(# 101)** those portions of Docket #99 that constitute Ms. Anderson's homestead exemption argument. The SEC's Motion for Default Judgment **(# 68)** against Defendant The End of the Rainbow Partners, LLC ("Rainbow") and Relief Defendant The End of the Rainbow Foundation, Inc. ("Foundation") is **GRANTED** as set forth below. The SEC's Motion for Summary Judgment **(# 70)** against Ms. Anderson is **GRANTED** as set forth below. Seaoma's Motion to Withdraw as Counsel **(# 76)** is **DENIED AS MOOT**.

The Clerk of the Court shall enter judgment in favor of the SEC and against the following Defendants in the following amounts:

- As against Rainbow in the amount of $1,715,594.
- As against the Foundation in the amount of $247,635.
- As against Ms. Anderson in the amount of $506,221.86.

- As against Seaoma in the amount of $402,465.17.

Upon the entry of such judgments, the Clerk of the Court shall close this case.

Dated this 7th day of February, 2020.

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
Senior United States District Judge